Filed 7/21/22  In re T.C. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

In re T.C., a Person Coming Under the Juvenile Court Law.

| | |
|---|---|
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E078016 |
| Plaintiff and Respondent, | (Super.Ct.No. J287107) |
| v. | OPINION |
| B.C., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Lynn M. Poncin, Judge.  Affirmed.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, Richard W. Van Frank, Deputy County Counsel, for Plaintiff and Respondent.

INTRODUCTION

B.C. (father) appeals from a juvenile court's order at the 12-month review hearing (Welf. & Inst. Code,[1] § 366.21, subd. (f)) terminating his reunification services and setting a hearing under section 366.26 to consider the implementation of a permanent plan regarding his son, T.C. (the child). Father contends that the court erred when it terminated his services since there was a substantial probability that the child could be returned to his care if the case was continued for an additional six months. We affirm.

PROCEDURAL BACKGROUND

On October 29, 2020, the San Bernardino County Children and Family Services (CFS) filed a section 300 petition on behalf of the child, alleging that he came within the provisions of subdivisions (b) (failure to protect), (g) (no provision for support), and (j) (abuse of sibling). The child was 14 years old at the time. The petition specifically alleged that the child suffered from behavioral and emotional problems, which father was unable to manage, thereby leaving the child at risk of abuse and neglect. The other allegations concerned the child's mother, S.W. (mother), who is not a party to this appeal.

The social worker filed a detention report stating that she received a referral on October 24, 2020, alleging the child had been self-harming with medication and cutting himself. A second referral was generated on the same day alleging the child was trying to stab himself, and he was hitting father with a sharp rock. The social worker reported that the child was recently discharged from Arora Charter Oak on October 20, 2020, with

---

[1] All further statutory references will be to the Welfare and Institutions Code unless otherwise indicated.

medications for sleep, depression, anxiety, and Attention Deficit Hyperactivity Disorder (ADHD). Within 10 minutes of being home, the child went to the pool and tried to kill himself. The social worker further reported that the child was removed from mother's custody in 2014 and at the time, father's whereabouts were unknown. The child was returned to father's home on August 8, 2016, under family maintenance, and the court dismissed the case on March 28, 2017, giving custody to father.

The social worker reviewed the calls of service in the last year, and they reflected the child reporting physical abuse by father and running away from home. One call was made on October 20, 2020, alleging that the child was being restrained by father, who was trying to prevent him from hurting himself. The child was observed as being assaultive toward father by the paternal grandfather (the PGF), who called law enforcement. A few days later, law enforcement responded to a call regarding the child being aggressive and stating he wanted to kill father and himself. Both incidents resulted in the child being sent to the hospital for a section 5150 assessment/hold.

During a previous referral in September 2020, the social worker spoke with a clinical therapist from the Department of Behavioral Health (DBH) who stated the child had made it clear that he did not wish to return home to his father and said he would go anywhere but his father's home. The therapist stated the child had major depressive disorder, Post Traumatic Stress Disorder, and ADHD. At one point, he was taking Zoloft, Guansacine, and melatonin. The therapist said the child told her he heard voices from three different people and that his father used to drink heavily and physically and verbally abused him. She reported that the child told her he wished to be with his

3

maternal family. He also said he would rather live in a group home than live with father. The social worker spoke with a social worker at Loma Linda Behavioral Medical Center, who stated that the child was very manipulative and made statements of wanting to hurt himself when things did not go his way.

On October 27, 2020, the social worker met with father and informed him that several referrals continued to be called in and, due to the increased amount of referrals and incidents of his son circulating the emergency rooms and mental health facilities, CFS was concerned for the child's and father's safety. Father said he too was concerned but did not know what to do. Father attributed the child's behaviors and statements to his mental health, as well as his animosity toward father for cutting off contact between the child and his maternal family. Father stated his son had not been able to be stable or consistent with taking his medication because he was never home long enough to take it. Father said he was willing to initiate detention proceedings so CFS could place the child in a safe environment to receive the proper mental health diagnosis and treatment and become stabilized on his medication.

The child was placed in Blissful Living Group Home on October 28, 2020. He was asked if he wanted to call his father, but the child did not want to speak to him.

The court held a detention hearing on October 30, 2020, and detained the child in Blissful Living Group Home. It also ordered supervised visitation for father and mother (the parents).

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report on November 16, 2020, recommending that the court sustain the petition and order reunification services for father, but deny them to mother. The social worker described in more detail the incident that occurred after the child was released from Aurora Charter Oak. According to father, when they got home, the child went into the backyard and walked toward the pool, as if to drown himself. Father stepped between the child and the pool and reportedly put his hand on the child's shoulder, and the child started attacking him. Father called for the PGF to call 911. When the police arrived, they placed the child on a section 5150 hold and took him to a hospital. He was released five days later. Once he was back at home, the child went to his bedroom and started breaking toys, tearing books, and punching the television. Father restrained him and told the PGF to call 911, and the child told the PGF that he was going to kill father. While father was trying to restrain the child, the child grabbed a lamp and broke it over father's head. The child then attempted to get the shards of glass from the broken lightbulb to cut father. Father managed to stop him until the police arrived. Father pressed charges for the assault by the child, and the child was placed on another section 5150 hold at the hospital. CFS arrived and, after consulting with the social worker, father signed the child into CFS care. The child was placed in Blissful Living Group Home where he had at least three special incident reports regarding going AWOL (absence without leave) and being hospitalized.

The social worker opined it would be detrimental to return the child to father's care. The child's behaviors were harmful to himself and others, and there would continue to be a risk until he became stabilized on medication due to his mental health disorders.

The court held a hearing on November 20, 2021, and agreed that father was unable to care for the child. It found the allegations true and sustained the petition. The court found father to be the presumed father of the child, declared the child a dependent, and removed him from the custody of the parents. The court ordered reunification services for father, but not mother. Father's case plan required him to participate in counseling and a parenting program. The court also ordered supervised visitation.

*Six-month Status Review*

The social worker filed a six-month status review report on May 19, 2021, recommending that the child continue in his placement and father continue with his services. The social worker reported that the child had been unable to maintain a placement due to his frequent AWOL's, delinquent behavior, and mental health concerns. He was removed from Blissful Living Group Home on November 2, 2020, when he set a towel on fire. He was admitted to Canyon Ridge Hospital from November 2, 2020, to November 9, 2020, then was transferred to Loma Linda University Medical Center from November 9, 2020, until November 13, 2020. The child was in the CFS office from November 13, 2020, to November 16, 2020, then went to Our House Shelter from November 16, 2020, to November 23, 2020, where he was snorting his medication and sharing it with other residents. He also attempted to put a screwdriver through his hand. The child was asked to leave and went back to the CFS office from November 23, 2020,

6

until November 24, 2020. He went to My Place Shelter from December 21, 2020, until December 31, 2020, where he threatened to cut himself with blades from a blender. The child was sent back to the CFS office from December 23, 2020, until December 26, 2020. He was admitted to Our House Shelter again from December 26, 2020, to December 27, 2020, and was sent back to the CFS office on December 27, 2020, until January 13, 2021. The child was admitted to Sycamore Hathaway Group Home on January 13, 2021, until February 16, 2021. He was caught in a stolen vehicle and had destroyed property. The child was sent to Juvenile Hall for the weekend but was released due to charges being dropped. The child went back to the CFS office for a few days, then was admitted to Downs & Martin Group Home from February 22, 2021, until March 22, 2021. While there he urinated in a cup and asked a resident to drink it, broke into a car and stole items, and brought knives to the group home and threatened the staff.

The social worker opined that group home placement was needed in order to assess the child for a higher level of care. There were several concerns regarding the child's mental health; however, due to his frequent AWOL's and placement changes, he had been unable to receive mental health services on a consistent basis. The child frequented homeless encampments where he got drugs and alcohol, and he had a history of using methamphetamines, cocaine, ecstasy, and marijuana. It was reported by one of the group home staff that the child influenced other children, and did self-harm, including cutting, homemade tattoos, and playing with lighters.

The social worker reported that the child was usually disrespectful to his father and would use profanity and threaten him. The child continued to state that father abused

7

him and that father was an alcoholic. The social worker noted father had offered minimal support when it came to getting the child stable and would often call to complain that nothing was being done to help his son. When asked if he was completing services, father said he did not know he had to complete services and that he had just started individual counseling and parenting on May 7, 2021. Father often threatened to sue CFS if anything happened to his son while in CFS care. Father was usually combative over the phone, and some phone calls were disconnected due to his inappropriateness and rude manner. Father wanted the child placed in a locked facility, and he told the social worker that he signed his son over for custody so that CFS could "fix" him. Father was asked about his past efforts to stabilize the child and if he had any ideas of what would work, and he stated that he had been unsuccessful due to his insurance not covering a locked facility or a higher level of care.

The social worker reported that father was enrolled in parenting classes and individual therapy and had completed one session of each. The social worker further reported that father had visited the child only one time, when the child was at Downs & Martin. The social worker offered visitations to father numerous times, but he declined. The one visit that took place was at the child's request. Prior to the visit, a meeting was held to address the child's mental health. During this meeting, father was informed that the child would like to be addressed by his new identified name, which was "Clover." Father refused to call the child any name except the name he was given at birth.

The social worker reported that father had not put forth any effort to visit with the child more than the one time at Downs & Martin. The child currently resided at T&T

8

Champions in Oakland, California, where he had been since March 15, 2021. Due to the child living in Oakland, father was content with video visits and phone calls. Most of the time the child stated he did not want to communicate with father. On April 21, 2021, when the child received a call from father, he became upset, told father he hated him, threatened to harm him, and told him to never call again.

The social worker noted the child was often angry when speaking with father and about father. He continued to say that father was emotionally and physically abusive in the past. The child said he wanted to live with mother in Tennessee or his grandmother in California. The social worker opined that at this time it would be a significant detriment to the child's emotional and physical well-being if he were ordered to return to father's care without stabilization.

The court held a six-month review hearing on May 20, 2021, and continued father's services and supervised visits. It then set the matter for a 12-month review.

*Twelve-month Status Review*

The social worker filed a 12-month status review report on November 4, 2021, recommending that father's services be terminated and the court order foster care with a permanent plan of placement with a fit and willing relative. (§ 366.22, subd. (a)(1).) The child was continuing with intensive mental health treatment and counseling provided by Wraparound Services and DBH. He had been hospitalized numerous times, and his medications were altered to assist in stabilizing him. The child's aggressive behavior was increasing, and he had become threatening to staff. In the past, the child refused to take his medications, but he currently "will most likely take his medications when asked."

9

The social worker reported that in the child's most recent placement at T&T Champions, the group home assisted by having him attend weekly Child and Family Team Meetings (CFTM) with DBH staff and others, enrolling him in school, enrolling him in outpatient substance abuse treatment, giving him medical and dental appointments, and having a psychiatrist monitor his medications. The group home reported multiple AWOL's that occurred almost daily. There were reports of threatening behavior, bullying other minors, self-harm, and taking others minors out of the home to AWOL. A 14-day notice was submitted by the group home due to the safety of the staff and other residents in the home, and the child was picked up by CFS on September 24, 2021. He was currently in the CFS office awaiting placement.

CFS requested unsupervised visitations after the 14-day notice was put in place since the child would be awaiting placement for an extended amount of time. CFS planned to allow father more visits since he did not see the child often. Father was granted unsupervised visitation with the child in hopes of reunification, but father stated he did not feel comfortable being with the child alone, citing that the child previously threatened to kill him.

The social worker reported that father completed his parenting class and continued to attend individual counseling. He also participated in the child's weekly CFTM's and would meet with the child, along with his wraparound team. Father stated he was not willing to reunify with the child until his son was able to receive a higher level of mental health services. Father often minimized the progress the child had made and continued to state the child needed to be under a conservatorship and in a locked facility. When

discussing how he could better engage with the child, father often emphasized the child's negative behaviors, which triggered the child. Father hardly acknowledged the services that were in place to help the child's mental health and continued to state the services were not working, and the child needed to be in a facility.

The social worker reported the relationship between father and the child continued to be strained. Father was not ready to accept the child's preferences on gender identity and refused to call him by his preferred name, "Clover." The child continued to state he did not want to live with father, saying that father was an alcoholic who was very controlling and who had previously put him in a chokehold.

The social worker opined that it would be a significant detriment to the child's emotional and physical well-being to be ordered to return to father's care. Father made it clear and emphasized his wishes that he did not want to reunify with the child due to the child not being stable. Father wanted the child to be placed in a locked facility for stability. The social worker further stated the child was in need of a stable living environment that would support his lifestyle and his challenges.

Thus, the social worker recommended that the court find by clear and convincing evidence the father has failed to make substantive progress in his case plan and find by a preponderance of the evidence that custody by father continued to be detrimental to the child and that return of the child to father would create a substantial risk of detriment to the child's safety, protection or physical/emotional well-being. The social worker also recommended that the court terminate father's services. She further recommended that the court find the permanent plan of placement in foster care with a permanent plan of

11

adoption to be appropriate, and that the child's current placement was appropriate and necessary.

The court held a 12-month hearing on November 5, 2021. Father's counsel stated that father wanted the court to know he was not giving up on the child, but "at this juncture, he believe[d] the situation with the child is at an impasse." Father felt he was being blamed when all he wanted was to see the child get effective help before something tragic happened. Father's counsel then objected to the termination of services. Counsel for the child informed the court that the child wanted to be placed in Oakland in "independent living" and wanted to have visitation with mother. The child directly addressed the court and said he was aware father wanted him to be in a locked facility, but the child felt that a locked facility would not benefit him. The court adopted the recommended findings and orders. It terminated father's services, ordered the child to remain a dependent, set a permanency plan review hearing for May 5, 2022, and asked CFS to assess if placement in Oakland was in the child's best interest.

## DISCUSSION

### The Court Properly Terminated Father's Reunification Services

Father argues the court erred in terminating his services at the 12-month hearing, asserting that a court can extend services beyond 12 months if it finds there is a substantial probability the child will be safely returned to the custody of the parent within the extended time period. He asserts that he voluntarily sought help from CFS and was participating in services with the hope of reunification. Thus, he contends the court's order terminating his services was not supported by substantial evidence. We disagree.

12

A. *Standard of Review*

"We review an order terminating reunification services to determine if it is supported by substantial evidence. [Citation.] In making this determination, we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders. [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' " (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688-689.) "Appellant has the burden to show that the evidence was not sufficient to support the findings and orders." (*In re Alexzander C.* (2017) 18 Cal.App.5th 438, 446 (*Alexzander C.*), overruled on other grounds, as stated in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)

B. *The Court Properly Terminated Father's Services*

"The dependency scheme sets up three distinct periods and three corresponding distinct escalating standards for the provision of reunification services to parents . . . . During the first period, which runs from roughly the jurisdictional hearing (§ 355) to the six-month review hearing (§ 366.21, subd. (e)), services are afforded essentially as a matter of right (§ 361.5, subd. (a)) . . . . During the second period, which runs from the six-month review hearing to the 12-month review hearing (§ 366.21, subd. (f)), a heightened showing is required to continue services. So long as reasonable services have in fact been provided, the juvenile court must find 'a substantial probability' that the child may be safely returned to the parent within six months in order to continue services. (§ 366.21, subd. (e).) During the final period, which runs from the 12-month review

13

hearing to the 18-month review hearing (§ 366.22), services are available only if the juvenile court finds specifically that the parent has 'consistently and regularly contacted and visited with the child,' made 'significant progress' on the problems that led to removal, and 'demonstrated the capacity and ability both to complete the objectives of his or her treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs.' " (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 845, fn. omitted; see § 366.21, subd. (g)(l)(A)-(C).)

Specifically, at the 12-month status review hearing, "[a]fter considering the relevant and admissible evidence, the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f)(1).) "The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§ 366.21, subd. (f)(1)(B).) "In making its determination, the court shall review and consider the social worker's report and recommendations and the report and recommendations of any child advocate appointed pursuant to Section 356.5, shall consider the efforts or progress, or both, demonstrated by the parent . . . and the extent to which he or she availed himself or herself of services provided, . . ." (§ 366.21, subd. (f)(1)(C).)

14

Here, at the 12-month review hearing, the court followed the social worker's recommendation and found by a preponderance of the evidence that the return of the child to father would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. (§ 366.21, subd. (f)(1).) We note that father did not dispute the findings, but merely said he believed "the situation with the child [was] at an impasse," felt he was being blamed, and objected to the termination of services. For the first time on appeal, father claims he satisfied the requirements that there was a substantial probability the child would be returned to his custody by the 18-month mark—specifically, that he "consistently and regularly contacted and visited with the child," made "significant progress" on the problems that led to removal, and "demonstrated the capacity and ability both to complete the objectives of his . . . treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs.[2] (§ 366.21, subd. (g)(1)(A)-(C).) However, father merely concludes that he satisfied the three requirements, without pointing to any supporting evidence. In fact, the evidence showed that father had not satisfied the requirements. It did not show that he "consistently and regularly contacted and visited with the child." (§ 366.21, subd. (g)(1)(A).) Rather, it showed that he kept in contact with the child

---

**2** We note respondent's claim that father forfeited the right to claim error on appeal since he failed to raise an objection to the juvenile court's findings or request the court to make the required finding that there was a substantial probability the child could be returned to his custody by the 18-month review hearing. Father points out that he objected to the court's termination of his services and thereby preserved his challenge on appeal. We will assume without deciding that father did not forfeit his challenge and exercise our discretion to hear the merits of father's argument notwithstanding any alleged forfeiture.

through phone calls and video visits and that when the social worker offered visitations numerous times, he declined to visit. The record reflects that father had one visit with the child, which was at the child's request, and that father made no effort to visit the child beyond that one visit. At one point when the child was awaiting placement, CFS requested, and father was granted unsupervised visits; however, father stated he did not feel comfortable being with the child alone since the child had previously threatened to kill him. We note that when the child received a call from father in April 2021, the child became upset during the call, told father he hated him, threatened to harm him, and told him to never call again.

Furthermore, at the time of the 12-month hearing, the child was receiving intensive mental health treatment, was on medication, and was receiving outpatient substance abuse treatment, yet his aggressive behavior was increasing, he was bullying other minors, he would AWOL almost daily, and he threatened others and participated in self-harm. Father himself stated that the services were not working and that the child needed to be in a locked facility. He also said he was unwilling to reunify with the child until the child received a higher level of mental health services. Thus, there was no evidence that father had the desire or the ability to deal with the child's many special needs. We further note the child consistently stated he did not want to live with father. In other words, the evidence showed that neither father nor the child wanted to reunify. We discern from this sad and troubling record no substantial probability that the child would be returned to father's custody within the 18-month time period set forth in the law. Rather, the evidence points compellingly otherwise.

16

We conclude that father has not met his burden of showing the evidence was insufficient to support the court's order terminating his services.  (*Alexzander C.*, *supra*, 18 Cal.App.5th at p. 446.)  In view of all the circumstances, the court properly terminated father's services at the 12-month hearing since return of the child to him would create a substantial risk of detriment to the child's emotional and physical well-being, and there was no substantial probability that the child would be returned to his custody within the 18-month time period.

## DISPOSITION

The court's order terminating father's services is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS_____
J.

We concur:

RAMIREZ_____
P. J.

SLOUGH_____
J.